UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 05-80002-CIV-HURLEY/HOPKINS



COMMODITY FUTURES TRADING COMMISSION,

Plaintiff,

vs.

UNITED INVESTORS GROUP, INC.; GREG P.
ALLOTTA; JAY M. LEVY; PAUL F. PLUNKETT;
ANDREW D. ROSS; and MICHAEL H. SAVITSKY
III,

Defendants,

GREG ALLOTTA ENTERPRISES, INC. and
MICHAEL SAVITSKY, INC.,

Relief Defendants.

**CLOSED CASE**



Consent Order of Permanent Injunction and Equitable Relief against
United Investors Group, Inc. Greg P. Allotta, Paul F. Plunkett, Andrew D. Ross,
Michael H. Savitsky III, Greg Allotta Enterprises, Inc. and Michael Savitsky, Inc.

## INTRODUCTION

On January 3, 2005, Plaintiff Commodity Futures Trading Commission (Commission,

CFTC, or Plaintiff) filed its Complaint in the above-captioned action against, among others,

defendants United Investors Group, Inc.(UIG); Greg P. Allotta; (Allotta); Paul F. Plunkett

(Plunkett); Andrew D. Ross (Ross); and Michael H. Savitsky III (Savitsky), and relief defendants

Greg Allotta Enterprises, Inc.(Allotta, Inc. and Michael Savitsky, Inc. (Savitsky, Inc.)

(collectively Settling Defendants) seeking injunctive and other equitable relief for violations of

1

the Commodity Exchange Act (the Act), 7 U.S.C. §§ 1 *et seq.* (2004), and the Regulations (Regulations) promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2005).

## I.   CONSENTS AND AGREEMENTS

To effect settlement of the matters alleged in the Complaint in this action Settling Defendants:

1.      Consent Order of Permanent Injunction and Equitable Relief against United Investors Group, Inc. Greg P. Allotta, Paul F. Plunkett, Andrew D. Ross, Michael H. Savitsky III, Greg Allotta Enterprises, Inc. and Michael Savitsky, Inc. ("Consent Order");

2.      Affirm that the Settling Defendants have agreed to this Consent Order voluntarily, and that no threat, or promise other than as contained herein, has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Consent Order;

3.      Acknowledge service of the summonses and Complaint;

4.      Admit the jurisdiction of this Court over them and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2004);

5.      Admit that venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2004);

6.      Waive:

   a.      all claims which they may possess under the Equal Access to Justice Act (EAJA), 5 U.S.C. § 504 (2000) and 28 U.S.C. § 2412 (2000), relating to, or arising from, this action, and any right under EAJA to seek costs, fees and other expenses relating to, or arising from, this action;

      b.     any claim of Double Jeopardy based upon the institution of this

proceeding or the entry in this proceeding of any order imposing a civil monetary

penalty or any other relief; and

      c.     all rights of appeal from this Consent Order;

7.     Consent to the continued jurisdiction of this Court for the purpose of enforcing

the terms and conditions of this Consent Order and for any other purposes relevant to this case,

even if Settling Defendants now or in the future reside outside the jurisdiction;

8.     Agree that neither Settling Defendants, nor any of their agents, employees or

representatives acting under their control, shall take any action or make any public statement

denying, directly or indirectly, any allegations in the Complaint or stipulations in this Consent

Order, or creating or tending to create the impression that the Complaint and this Consent Order

are without factual basis; provided, however, that nothing in this provision shall affect Settling

Defendants': i) testimonial obligations, or ii) right to take legal positions in other proceedings to

which the Commission is not a party. Settling Defendants will undertake all steps necessary to

assure that their agents, employees and representatives understand and comply with this

agreement;

9.     In consenting to the entry of this Consent Order, Settling Defendants neither

admit nor deny the Stipulated Facts and Conclusions of Law set forth in Part II; and

10.    Solely with respect to any current or subsequent bankruptcy proceeding filed by,

on behalf of, or against any defendant or relief defendant, or any proceeding to enforce this

Order, Settling Defendants agree and intend that the allegations of the Complaint and all of the

Stipulations of Fact and Law as contained in Part II of this Consent Order shall be taken as true

and correct and be given preclusive effect, without further proof. Each Settling Defendant shall

3

provide immediate notice of any bankruptcy filed by, on behalf of, or against that defendant or relief defendant and shall provide immediate notice of any change of address, phone number, or contact information in the manner required by Part IV of this Consent Order.

11.     Each Settling Defendants agrees to cooperate with Commission staff in the continuing litigation of this matter against any defendant or relief defendant not a party to this Consent Order.  As part of such cooperation, each defendant and relief defendant agrees, subject to all applicable privileges, to comply fully, promptly and truthfully to any inquiries or requests for information or testimony, including but not limited to, testifying completely and truthfully in this action and producing statements or trial declarations to the Commission related to any trial of the subject matter of this proceeding;

12.     The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay.   The Court – without making any findings as to the Stipulated Facts and Conclusions of Law set forth herein – directs the entry of the Stipulated Facts and Conclusions of Law and a permanent injunction and equitable relief, pursuant to §6c of the Act, 7 U.S.C. §13a-1, as set forth herein.

13.     This Consent Order is shall not bind any party who is not a signatory hereto.

## II.     STIPULATED FACTS AND CONCLUSIONS OF LAW

Settling Defendants consent to the entry of this Consent Order solely for purposes of settling this case.  Further, Settling Defendants neither admit nor deny the Stipulated Facts and Conclusions of Law set forth in Part II herein.  The Court makes no findings with respect to the Stipulated Facts and Conclusions of Law set forth in Part II herein.

## STIPULATED FACTS

**A.     The Commodity Exchange Act**

The Commodity Exchange Act (the Act), as amended, 7 U.S.C. § 1 et seq. (2004), and the Commodity Futures Trading Commission's Regulations (Regulations), 17 C.F.R. § 1.1 et seq. (2005), establish a comprehensive system for regulating the purchase and sale of commodity futures contracts and options on commodity futures contracts (options).  One of the primary purposes of the Act and Regulations is consumer protection.

**B.      United Investors Group**

United Investors Group (UIG) was a Florida corporation with its principal place of business in Boca Raton, Florida 33433.  UIG has been registered with the Commission  as an Introducing Broker (IB) since May 7, 2001.  Under the Act, an IB is "any person ... engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market ... who does not accept any money, securities, or property." Section 1a(23) of the Act, 7 U.S.C. § 1a(23).  The term "person" is defined under the Act to include corporations.  Section 1a(28) of the Act, 7 U.S.C. § 1a(28).

UIG's primary business was to solicit customers to purchase options through Universal Financial Holding Corporation (UFHC), a Futures Commission Merchant (FCM)  UIG employed Associated Persons (APs) to conduct its business.  An AP is any natural person associated with an FCM or IB, who (i) solicits or accepts customers' or options customers' orders; or (ii) supervises any person or persons so engaged.  *See* Regulation 1.3(aa)(1) & (2), 17 C.F.R. § 1.3(aa)(1) & (2).  As a result of the sales solicitations of its Associated Persons (AP), UIG generated $6,822,748 in commissions.

**C.      Greg P. Allotta**

Greg P. Allotta ("Allotta") is an individual residing in Boca Raton, Florida.  Allotta first registered with the Commission in 1993 as an AP.  Before registering as a UIG AP in 2003,

Allotta worked at six different firms, including four firms disciplined for sales solicitation fraud by the Business Conduct Committee of the National Futures Association ("NFA"), the commodity industry's self-regulatory authority.  A fifth firm is named as a defendant in a sales solicitation fraud suit filed by the Commission in 2006 before this Court.  Individually, Allotta has been a subject of two regulatory actions, one of which resulted in the NFA's assessment against him of a $12,000 fine and a one-year period of enhanced supervisory procedures.  As a result of his sales solicitations at UIG, Allotta made $256,951 in salary and commissions.

**D.      Michael H. Savitsky III**

Michael H. Savitsky III (Savitsky) is an individual residing 9n Boca Raton, Florida 33486.  He first registered with the Commission in 2000.  Since 2000, Savitsky has been registered with five firms.  One of those firms closed in 2003 as part of the settlement of a regulatory action for sales solicitation fraud brought against them by the NFA.  In 2004, the Commission sued another one of those firms, as well as Savitsky in his personal capacity, for sales solicitation fraud which is currently pending before the Court.  He was registered as an AP of UIG from May 10, 2001 to November 27, 2001.  On August 4, 2003, Savitsky again registered as an AP of UIG.  Savitsky's UIG registration has been conditional since December 1, 2003 based on a violation of NFA registration rules As a result of his sales solicitations at UIG, Savitsky made $30,590.88 in salary and commissions.

**E.      Paul F. Plunkett**

Paul F. Plunkett (Plunkett) is an individual residing at Deerfield, Florida 33441.  Plunkett first registered as an AP and was listed as a principal with the Commission in early 2002.  Since 2002, he has been a principal at six different firms, including one firm that the Commission recently sued for sales solicitation fraud and which is currently pending before the Court.

Plunkett has been registered as an AP and was listed as a principal of UIG from September 3, 2003 to March 26, 2004 and from May 17, 2004 until the present. Starting on May 18, 2004, Plunkett supervised UIG's daily operations. Plunkett was responsible for the hiring, firing, supervision, and discipline of UIG APs. In addition, Plunkett was responsible for obtaining, reviewing, responding to, and resolving UIG customer complaints. Plunkett made $630,600 in salary and commissions while at UIG.

**F.    Andrew D. Ross**

Andrew D. Ross (Ross) is an individual residing, Boca Raton, Florida 33432. Ross first registered with the Commission as an AP in 1995. Prior to registering at UIG as an AP on August 19, 2003, he worked at four different firms, two of which were sued by the Commission for sales solicitation fraud, one of which is currently pending before the Court. Ross became a principal of UIG on October 2, 2003, and he withdrew as both an AP and a principal of UIG on May 18, 2004. While a UIG principal, Ross was responsible for the hiring, firing, supervision, and discipline of UIG APs. Ross's office was located nearby the room where UIG APs telephoned customers, and Ross routinely walked around this room to observe the AP's solicitation activities. In addition, Ross was the UIG compliance officer responsible for obtaining, reviewing, responding to, and resolving customer complaints. In his compliance officer capacity, Ross spoke to several UIG customers regarding complaints about UIG APs. Ross is not currently registered with the Commission in any capacity. Ross made $127,835.87 in salary and commissions while at UIG.

**G.    Greg Allotta Enterprises, Inc.**

Relief defendant Greg Allotta Enterprises, Inc. ("Allotta, Inc.") is a Florida corporation with its principal place of business at 384 Mohawk Lane, Boca Raton, Florida 33487. Allotta,

Inc. has never been registered with the Commission. In addition to the $256,951 in salary and commissions Allotta received directly, he also received $121,574 in commission payments and salary from UIG through Allotta, Inc.

**H.      Michael Savitsky, Inc**

Relief defendant Michael Savitsky, Inc. (Savitsky, Inc.) is a Florida corporation with its principal place of business at 4721 N.E. 22 Avenue, Lighthouse Point, Florida 33064. Savitsky, Inc. has never been registered with the Commission. In addition to the $30,590.88 in salary and commissions Savitsky received directly, he received $76,559.34 in commission payments and salary from UIG through Savitsky, Inc.

**I.      Telephone Sales Solicitation**

Since at least August 2003, UIG APs including, but not limited to, Allotta and Savitsky, solicited members of the general public to open accounts to trade options. To induce customers to trade, Allotta and Savitsky, as well as other UIG APs misrepresented the risks and rewards of trading options. In telephone calls, Allotta, Savitsky, and other UIG APs engaged in fraudulent sales solicitations by knowingly misrepresenting and failing to disclose material facts concerning, among other things: (i) the profit potential of options; (ii) the risk involved in trading options; and (iii) the poor performance record of UIG customers trading options.

**1.      Misrepresentations Regarding the Profit Potential of Options**

From their very first interaction with potential customers, Allotta, Savitsky, and other UIG APs systematically misrepresented the profit potential involved with trading options and the likelihood that this profit would be achieved. In addition, they provided deceiving investment advice that improperly relied on seasonal trends, well-known public information already factored in by the relevant commodity markets, and misleading leveraging examples to entice customers to trade through UIG.

8

### a.    Allotta, Savitsky, and Other UIG APs
### Misrepresented the Return on Options

Allotta, Savitsky, and other UIG APs repeatedly informed their customers that they

would make substantial amounts of money in a very short time by trading options.  For example:

Allotta told customers that they could make double or triple their money by trading energy

options.  Savitsky told his customers they could make a lot of money quickly by trading through

UIG and that UIG had made their prior customers substantial sums of money.  Other UIG APs

made similar statements to customers about the high profits that could be made in short time

frames by investing through UIG.

### b.    Allotta, Savitsky, and Other UIG APs
### Misrepresented the Likelihood of Profit Based Upon
### Seasonal Trends and Well-Known Public Information

Allotta, Savitsky, and other UIG APs routinely told their customers to trade options based

primarily upon seasonal trends and well-known public information.  Seasonal trends and well-

known public information already are factored into the price of the underlying option.

Nevertheless, Allotta, Savitsky, and other UIG APs habitually referred to seasonal trends and

other well-known public information as the primary, if not the sole, basis to trade options.  For

example: Allotta, Savitsky, and other UIG APs told customers that the price of heating oil rises

in the winter and that the war in Iraq affects the price of oil and, therefore, crude oil, unleaded

gas and/or heating oil options would be profitable.

### c.    Allotta, Savitsky, and Other UIG
### APs Used Misleading Leverage Examples

Allotta, Savitsky, and other UIG APs also enticed customers to invest using misleading

leverage examples that highlight large profit potential with only a small investment amount.

These leverage examples suggested to customers that small movements in the market would

generate large profits. Savitsky told a customer that he would make $420 per option each time the heating oil market moved one cent. Other UIG APs represented to customers that they would make $420 per option each time the market moved one cent thereby profiting $12,600 on three $1,000 options with only a ten-cent increase in the market.

> **d.    Allotta, Savitsky and Other UIG APs**
> **Improperly Connected Profits to Immediate Investment**

Allotta, Savitsky, and other UIG APs, commonly told customers that they needed to invest immediately or they might lose profits. By using this high-pressure tactic, they gave the impression that profits were certain or guaranteed, the only variable being the amount of profit to be made. Among these types of representations, Allotta told a customer that this "was a once in a lifetime opportunity" and that he should do whatever he could to come up with money to invest. Savitsky told a customer that a delay in trading would cause him to lose out on profits. Other UIG APs told customers that they needed to act fast because they would lose out on profits if they waited.

> **2.    Misrepresentations and Omissions Concerning the Risk of Options Trading**

Allotta, Savitsky, and other UIG APs also routinely failed to adequately disclose the risk of loss inherent in trading options. For example Allotta told customers that their strategies of purchasing both calls and puts made options a risk-free investment and that it was impossible to lose money trading options through UIG because they were going to make money whether the market moved up or down. Allotta, Savitsky and other UIG APs told customers they would not lose much money trading options because UIG would have stop-loss orders in place to protect their investments.

> **3.    Failure to Disclose UIG's Losing Performance Record**

Although Allotta, Savitsky, and other UIG APs urged customers to invest immediately with promises of large profits with little or no risk, they never disclosed that the firm's investment strategy resulted in millions of dollars in customer losses. Despite these mounting losses, Allotta, Savitsky, and other UIG APs continued to solicit new customers by highlighting profit without disclosing the fact that an overwhelming majority of UIG customers lost most, if not all, of their investment.

Between August 2003 and November 2004, UIG opened approximately 500 new options trading accounts. Over 95% of these accounts lost money. UIG customers realized combined losses of approximately $8,050,661. At the same time, UIG generated approximately $6,822,748 in commissions and fees from customers.

## STIPULATED CONCLUSIONS OF LAW

### A.    Liability

UIG, Allotta, Savitsky, Plunkett, and Ross are liable for violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Section 33.10 of the Regulations, 17 C.F.R. § 33.10. Further, Allotta, Inc. and Savitsky, Inc. received ill-gotten gains as a result of Allotta's and Savitsky's fraud, respectively.

### 1.    Allotta, Savitsky, and Other UIG APs Committed Sales Solicitation Fraud

Section 4c(b), 7 U.S.C. § 6c(b), provides "No person shall . . . enter into or confirm the execution of any transaction involving any . . . option . . . contrary to any . . . regulation of the Commission." Regulation 33.10, 17 C.F.R. § 33.10, provides:

> It shall be unlawful for any person directly or indirectly—(a) to cheat or defraud or attempt to cheat or defraud any other person ... (c) to deceive or attempt to deceive any other person by any means whatsoever in connection with an offer to enter into, the entry into,

11

the confirmation of the execution of, or the maintenance of, any commodity option transaction.

Under these provisions, liability for solicitation fraud involving options is established when a person or entity 1) makes a misrepresentation, misleading statement, or a deceptive omission; 2) acts with scienter; and 3) the misrepresentation is material. CFTC v. R.J. Fitzgerald & Co., 310 F.3d 1321, 1328 (11th Cir. 2002); CFTC v. Rosenberg, 85 F.Supp.2d 424, 446-47 (D.N.J. 2000). As set forth below, these three requirements are fully satisfied in the case at hand.

### a.   Allotta, Savitsky, and Other UIG APs Misrepresented and Omitted Material Facts Regarding Profit Potential and Risks of Trading Options

Allotta, Savitsky, and other UIG APs defrauded customers when they misrepresented the likelihood and extent of profits to be made trading options. "Any guarantee of profit and assurance against loss in the context of futures trading is inherently a fraudulent misrepresentation because investments in futures transactions necessarily depend on speculative predictions about an unpredictable future and risk is unavoidable." CFTC v. Standard Forex, Inc., [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,063 at 41,462 (E.D.N.Y. Aug. 9, 1993). The R.J. Fitzgerald court found that promises of 200 or 300 percent profit constituted fraud. 310 F.3d at 1329; see also CFTC v. Commonwealth Fin. Group, Inc., 874 F. Supp. 1345, 1352 (S.D. Fla. 1994). Here, UIG APs repeatedly promised customers that they would at least double or triple their investments in less than a few months. These statements about profit potential are fraudulent misrepresentations because over 95 percent of the customers who opened accounts at UIG prior to November 2004 lost some or all of the money they used to purchase these options. Indeed, these statements fraudulently misrepresented the profitability of options while at the same time omitted the risk of loss involved with trading options.

Second, customers were defrauded when Allotta, Savitsky, and other UIG APs misrepresented that seasonal trends, such as increased summer travel and cold weather, as well as well-known public information, will translate into predictable market movements that yield enormous profits with little or no risk. Claims that customers may capitalize upon these events are misleading and fraudulent because well-developed markets already reflect all publicly available information. Bishop v. First Investors Group of the Palm Beaches, Inc., [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,004 at 44,841 (CFTC Mar. 26, 1997); see also In re Staryk, [1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26, 701 at 43,928-30(ALJ June 5, 1996), aff'd in relevant part and vacated in part, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27, 206 (CFTC Dec. 18, 1997). Similarly, well-known public information also already is factored into the price of a commodity, and hence the price of an option on that commodity. Basic Inc. v. Levinson, 485 U.S. 224, 241-42 (1988) (finding that well-developed markets reflect all publicly available information); see also In re LTV Sec. Litig., 88 F.R.D. 134, 143 (N.D. Tex. 1980) ("The market [acts] as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.")

As a result, Allotta, Savitsky, and other UIG APs' claims linking profits on commodity options to seasonal trends and well-known public information constitute fraud as a matter of law. R.J. Fitzgerald, 310 F.3d at 1330. Specifically, it is unlawful to represent, as they did, that a customer will profit from options because demand for heating oil increases in the winter and demand for unleaded gas increases in the summer. These seasonal claims are particularly deceptive because "the movement of a cash price or the underlying futures contract seldom produces a directly proportional increase in the value of the option on the futures contract."

Commonwealth Fin. Group, Inc., 874 F. Supp. at 1352; see also R.J. Fitzgerald, 310 F.3d at

1331-32; Bishop, ¶ 27,004 at 44,481.  As the Commission explained:

> ...[S]uch history-based statements do not escape our scrutiny
> merely because such a profit was possible, [and] indeed, had
> actually been earned at a particular historical point. . . .  Without
> additional historical context, such as the frequency of the described
> market movement and whether market fundamentals or related
> circumstances have changed since the last occurrence, and some
> cautionary language about the difficulty of catching a market trend
> and escaping its reversal, customers can be misled by undue
> emphasis on such historical successes.

In re JCC, Inc., [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,080 at 41,576

(CFTC May 12, 1994), aff'd, 63 F.3d 1557 (11th Cir. 1995).  Likewise, it is unlawful for Allotta,

Savitsky, and other UIG APs to advise customers that trading options would be profitable based

upon well-known public information concerning the war in Iraq and other international current

events.

Third, Allotta, Savitsky, and other UIG APs regularly urged customers to begin trading

immediately or miss the opportunity to make maximum profits.  According to Allotta, this so-

called opportunity comes only once in a lifetime.  Such high-pressure sales tactics falsely convey

the impression that profits are guaranteed and that the only variable is the amount of the profit to

be made by the customer.  R.J. Fitzgerald, 310 F.3d at 1329.  This type of sales practice is

tantamount to a guarantee that is forbidden by the Act's anti-fraud provisions.  See

Commonwealth Fin. Group., 874 F. Supp. at 1353 (combining claims that risks are subject to

certain limitations with "predictions of profits [that] exceed[ed] 'mere optimism'" violated §

4c(b) of the Act and § 33.10 of the Regulations).

Fourth, Allotta, Savitsky, and other UIG APs defrauded customers when they omitted to

advise their customers about the potential risks of trading options.  "It is misleading and

deceptive to speak of 'limited risk' and [high] profits without also telling the reasonable listener

that the overwhelming bulk of firm customers lose money." <u>R.J. Fitzgerald</u>, 310 F.3d at 1333;

<u>see also</u> <u>Munnell v. Paine Webber Jackson & Curtis</u>, [1986-1987 Transfer Binder] Comm. Fut.

L. Rep. (CCH) ¶ 23,313 at 32,862-63 (CFTC Oct. 8, 1986) (internal citation omitted). Allotta,

Savitsky, and other UIG APs repeatedly reassured their customers that the risk of loss was

minimal, if not nonexistent. For example, Allotta told customers they would not lose money

trading options through UIG because their trading strategies made money for customers whether

the market moved up or down. Allotta, Savitsky, and other UIG APs convinced customers that

trading options through UIG was low risk because stop-loss orders largely limited any customer

losses. Such statements clearly convey the false idea that trading options involves little or no

risk.

Despite their optimistic representations regarding profits, UIG APs never disclosed to

their prospective customers the firm's losing trading record. As the court noted in <u>R.J.</u>

<u>Fitzgerald</u>, these omissions are fraudulent:

> Given the extremely rosy picture for profit potential painted by
> [defendants], a reasonable investor <u>surely</u> would want to know--
> before committing money to a broker--that 95% or more of [the
> firm's] investors lost money.... [I]t is misleading and deceptive to
> speak of "limited risk" and "200-300" percent profits without also
> telling the reasonable listener that the overwhelming bulk of firm
> customers lose money.

310 F.3d at 1332-33 (emphasis in original). In this case, the customer account statements

demonstrate that the overwhelming number of UIG customers lost money trading with the firm.

Further, the customer account statements demonstrate that no customer doubled or tripled their

options investment as Settling Defendants stated they would.

To the extent that Allotta, Savitsky and other UIG APs claim that they provided their

customers with the Commission's standard risk disclosure under Regulation 33.7, 17 C.F.R.

§ 33.7, such statements are no defense to their clear misconduct. It is well settled that wildly

unrealistic predictions of profit cannot be cured by the Commission's mandated risk disclosures. R.J. Fitzgerald, 310 F.3d at 1329 (providing that highly alluring statements overstating profit potential accompanied by only boilerplate risk disclosure creates an overall message that is deceptive and misleading); CFTC v. Sidoti, 178 F.3d 1132, 1136 (11th Cir. 1999) ("We seriously doubt whether boilerplate risk disclosure language could ever render an earlier material misrepresentation immaterial."); Clayton Brokerage Co. v. CFTC, 794 F.2d 573, 580 (11th Cir. 1986) (per curiam) (holding that "[o]ral representations may effectively nullify the warnings in the statement by discounting its general significance and its relevance to the customer's particular situation.") Here, Allotta, Savitsky, and other UIG APs' conduct nullified any standard disclosures that their customers received about risk. By making countless representations in violation of the Act, a subsequent risk disclosure does not absolve them of their wrongdoings.

**b.**       **Allotta, Savitsky, and Other UIG APs Acted with Scienter**

Scienter "refers to a mental state embracing an intent to deceive, manipulate, or defraud." Rosenberg, 85 F.Supp.2d at 448 (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976)). The Commission "need not show that defendants acted with an evil motive or an intent to injure[;] rather, recklessness is sufficient to satisfy the scienter requirement." Id. (internal quotations and citation omitted); see also Drexel Burnham Lambert, Inc. v. CFTC, 850 F.2d 742, 748 (D.C. Cir. 1988). "Knowledge, of course, exists when one acts in careless disregard of whether his acts amount to cheating . . . . That is, the element of knowledge cannot be precluded by ignorance brought about by willfully or carelessly ignoring the truth." CFTC v. Savage, 611 F.2d 270, 283 (9th Cir. 1979). Even absent direct evidence regarding the intent of a firm's principals and brokers, the Southern District of Florida has held that the requirements of scienter

16

are satisfied where the principals and brokers of a firm are aware of the significant losses suffered by their clients. Commonwealth Fin. Group, 874 F. Supp. at 1354-55.

Each of Allotta, Savitsky, and the other UIG APs' misrepresentations and omissions demonstrates that they acted with the requisite scienter. Given the firm's losing trading record, Allotta, Savitsky, and other UIG APs obviously knew that the probability of earning enormous profits on options was, to say the least, highly unlikely. They also knew that seasonal trends and international events would not lead to guaranteed profits as none of their customers had profited from this type of well-known information. Most importantly, Allotta, Savitsky, and other UIG APs had no reasonable basis to assert that the risk of loss was minimal when 95% percent of customers who opened accounts with UIG before November 2004 lost all or part of their money. As such, Settling Defendants acted with scienter.

**c.    Allotta, Savitsky, and Other UIG APs'
Misrepresentations and Omissions Were Material**

In order to establish solicitation fraud in violation of the Act and Regulations, the Commission must demonstrate that a false statement was material. A statement is material if "it is substantially likely that a reasonable investor would consider the matter important in making an investment decision." R.J. Fitzgerald, 310 F.3d at 1328 (internal quotation omitted); Rosenberger, 85 F.Supp.2d at 447; see also Commonwealth Fin. Group, 874 F. Supp. at 1353-54. Any fact that enables customers to assess independently the risk inherent in their investment and the likelihood of profit is a material fact. In re Commodities Int'l Corp., [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,943 at 44,563-64 (CFTC Jan. 14, 1997).

Each of the misrepresentations regarding the profitability of investing in options, the guarantees about seasonal trends and well-known public information, the false sense of urgency, and the omissions regarding the firm's track record made by Allotta, Savitsky, and other UIG

17

APs went to the heart of the customers' decision-making processes. Each misrepresentation and omission directly affected the profitability of the investment or the risk of loss involved with the options trading. Accordingly, the misrepresentations and omissions are material.

**2.      UIG Is Liable for the Unlawful Conduct of Its APs**

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), provides that the "act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person." UIG's APs fraud and misrepresentations, as described above, occurred within the scope of their employment with UIG; thus, UIG is liable for their unlawful conduct pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B).

**3.      Ross and Plunkett are Liable Under the Act as Controlling Persons**

Ross and Plunkett are liable for the solicitation fraud of Allotta, Savitsky, and other UIG APs because they are controlling persons pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b). "A fundamental purpose of section 13(b) is to allow the Commission to reach behind a corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself." In re JCC, ¶ 26,080 at 41,578 (finding principals of company liable because they were officers of corporation who were involved in monitoring sales activities). Pursuant to the Act, a controlling person is defined as "[a]ny person who, directly or indirectly, controls any person who has violated any provision of the Act [if that controlling person] did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." Section 13(b) of the Act, 7 U.S.C. §13c(b).

To establish the "knowing inducement" element of the controlling-person violation, the Commission must show that the "the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." In re Spiegel, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,767 (CFTC Jan. 12, 1988). Controlling persons cannot avoid liability by deliberately or recklessly avoiding knowledge about potential wrongdoing. Id. Indeed, constructive knowledge of wrongdoing is sufficient for a finding of knowing inducement. JCC, 63 F.3d at 1568. To support a finding of constructive knowledge, the Commission must show that Ross and Plunkett "lack[ed] actual knowledge only because [they] consciously avoided it." Id. (citations omitted).

Under this standard, Ross is a controlling person. As principal and a compliance officer of UIG from October 2, 2003 to May 18, 2004, Ross played a central role in the operation of the company. Ross was responsible for the hiring and firing of UIG APs, as well as any disciplinary action taken against them. Ross's office at UIG was located near the room used by UIG APs to telephone customers. Ross routinely walked around that room and observed the APs' solicitation activities. In addition, Ross claimed responsibility for obtaining, reviewing, responding to, and resolving UIG customer complaints. In this regard, Ross spoke to some UIG customers regarding complaints about UIG APs. Further, Ross also participated in the telephone sales solicitation fraud engaged in by UIG APs.

Plunkett is also a controlling person. Plunkett, a former UIG principal, relisted with the NFA as a UIG principal effective May 17, 2004. Plunkett immediately assumed Ross's duties and responsibilities and began supervising UIG's daily operations. Plunkett trained UIG APs, monitored their sales solicitations, and administered any disciplinary actions taken against them

19

by UIG.  In addition, Plunkett was responsible for obtaining, reviewing, responding to, and resolving customer complaints.

### III.   SANCTIONS

#### 1.   Permanent Injunction

With the consent of the Parties, the Court **ORDERS** that Settling Defendants are permanently enjoined from engaging in any conduct that violates Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 33.10, 17 C.F.R. § 33.10, and from engaging in any commodity-related activity including:

    a)  Making sales solicitations to customers that:

        i.      misrepresent the profit potential in commodities trading;

        ii.     omit that the market factors into the price of commodities seasonal trends and well-known market events;

        iii.    omit the actual track record of the broker or firm;

        iv.    omit or downplay the risk involved in commodity trading; and

        v.     omit any material fact necessary to make other facts disclosed not misleading;

    b)  Engaging in, controlling or directing the trading for any commodity futures, security futures, options, options on futures, or foreign currency options account, in any markets or on any entity regulated by the Commission or on behalf of any other person or entity, whether by power of attorney or otherwise; and

    c)  Applying for registration or seeking exemption from registration with the Commission in any capacity or engaging in any activity requiring registration or exemption from registration, except as provided for in Commission Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9),

and acting, directly or indirectly, as a principal, officer, director, supervisor, agent or employee

of any person registered, required to be registered or exempted from registration, unless such

exemption is pursuant to Commission Regulation 4.14(a)(9). This includes, but is not limited to,

soliciting, accepting or receiving any funds, revenue or other property from any person, giving

commodity trading advice for compensation or soliciting prospective customers related to the

purchase or sale of any commodity futures, security futures, options, options on futures, or

foreign currency futures, except as provided for in Commission Regulation 4.14(a)(9), 17 C.F.R.

§ 4.41(a)(9).

### 2.    Restitution

With the consent of the Parties, the Court further **ORDERS** that Settling Defendants are

jointly and severally liable for restitution to customers in the following amounts, provided that

the joint and several liability of each such person or entity is capped at the amount of restitution

listed for that person or entity below:

| | |
|---|---|
| UIG | $8,025,020.64 |
| Allotta; Allotta, Inc | $1,621,000 |
| Savitsky, Savitsky, Inc | $893,000 |
| Plunkett | $3,569,400 |
| Ross | $3,772,000 |

All restitution payments are immediately due and owing.

To effect payment by Settling Defendants and distribution of restitution to Settling

Defendants' customers, the Court appoints Daniel Driscoll of the National Futures Association

as Monitor (Monitor). The Monitor shall collect restitution payments from Settling Defendants

and compute pro rata allocations to injured customers identified in Appendix A to this Consent Order. As the Monitor is not being specially compensated for these services, and these services are outside the normal duties of the Monitor, he shall not be liable for any action or inaction arising from his appointment as Monitor, other than actions involving fraud.

The Monitor will distribute restitution funds obtained from Settling Defendants in an equitable fashion as determined by the Monitor to each of the customers identified in Attachment A to this Consent Order. Nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under federal, state, or common law to assert a claim for recovery against Settling Defendants subject to any offset or credit that Settling Defendants may be entitled to claim under the law governing that customer's claim. Subsequent to the entry of this Consent Order, each Settling Defendants shall provide the Commission and the Monitor with immediate notice of any filing or compromise and settlement of any private or governmental actions relating to the subject matter of this Order in the manner required by Part IV of this Consent Order.

### 3.    Civil Monetary Penalties

With the consent of the Parties, the Court further **ORDERS** that the following civil monetary penalties are assessed and immediately due and owing:

|  |  |
|---|---|
| UIG | $16,299,903 |
| Allotta | $379,000 |
| Savitsky | $107,000 |
| Plunkett | $630,600 |
| Ross | $128,000 |

22

Settling Defendants shall make their CMP payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, made payable to the Commodity Futures Trading Commission, and sent to Dennese Posey, or her successor, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581, under a cover letter that identifies them and the name and docket number of the proceeding. Each Settling Defendant shall simultaneously transmit a copy of the cover letter and the form of payment to the Monitor and to Gregory Mocek, or his successor, Director, Division of Enforcement, Commodity Futures Trading Commission, at the following address: Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

### 4.    Interest

With the consent of the Parties, the Court further **ORDERS** that pre and post-judgment interest on the restitution amount shall be paid at the then prevailing underpayment rate established by the Internal Revenue Service pursuant to 26 U.S.C. § 6621 and post-judgment interest be paid at the then prevailing Treasury Bill rate pursuant to 28 U.S.C. § 1961.

### IV.    MISCELLANEOUS PROVISIONS

Notification of Financial Institutions: The parties stipulate that upon the issuance of this Order, the Commission shall promptly provide each of the financial institutions identified in this paragraph with a copy of this Order. Within thirty (30) days of receiving a copy of this Consent Order, each of the financial institutions identified in this paragraph are specifically directed to liquidate and release any and all funds held by Settling Defendants in any account as of the date of the entry of this Consent Order, whether the account is held singly or jointly with another Settling Defendant identified herein, or in any other capacity, and to convey by wire transfer to

an account designated by the Monitor, any and all funds contained in those accounts, less any

amounts required to cover the banks' outstanding administrative or wire transfer fees. The

transfer of such funds represents an offset to Settling Defendants aggregate joint and several

restitution. At no time during the liquidation, release and/or wire transfer of these funds pursuant

to this Consent Order shall Settling Defendants be afforded any access to, or be provided with,

any funds from these accounts. Settling Defendants, as well as all banks and financial

institutions listed in this Consent Order, shall cooperate fully and expeditiously with the

Commission and Monitor in the liquidation, release and wire.   The accounts to be liquidated,

released and transferred are held at the following financial institutions:

| | |
|---|---|
| UIG | Bank of America |
| Allotta, | Bank of America |
| Allotta Inc. | Smith Barney |
| | Washington Mutual |
| Savitsky | Bank of America |
| | American Express Financial |
| | Advisors |
| Plunkett | Bank of America |
| | Federated Bank |
| | PBHG Funds |
| | Strong Financial |
| | Wachovia National Bank |
| | AIM |
| Ross | Bank of America |

UIG accounts held at Bank of America in the name of United Financial Group, Inc. and

International Investors Corporation are specifically included in this Consent Order and are

subject to liquidation by the Monitor.

   Temporary Receiver: Upon entry of this Consent Order, the Temporary Receiver shall be

discharged of its duties with respect to the Settling Defendants, and any claims for costs and fees

by the Temporary Receiver shall be paid from Settling Defendants' assets as of the date of entry of this Consent Order.

Equitable Relief:  The equitable relief provisions of this Consent Order shall be binding upon Settling Defendants and any person who is acting in the capacity of officer, agent, employee, servant, or attorney of Settling Defendants, and any person acting in active concert or participation with Settling Defendants and those equitable relief provisions that relate to restitution shall be binding on any financial institutions listed above or holding frozen funds or assets of the Settling Defendants, who receives actual notice of this Consent Order by personal service or otherwise.

Notices:   All notices required to be given by any provision in this Consent Order shall be sent certified mail, return receipt requested, as follows: Notice to Commission: Attention - Director of Enforcement, Commodity Futures Trading Commission, Division of Enforcement, 1155 21st Street N.W., Washington, DC 20581; Notice to NFA – Daniel Driscoll, National Futures Association, 200 W. Madison St., #1600, Chicago, IL 60606-3447.

Entire Agreement and Amendments:   This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto.   Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless:  (1) reduced to writing; (2) signed by all parties hereto; and (3) approved by order of this Court.

Invalidation:   If any provision of this Consent Order, or if the application of any provisions or circumstances is held invalid, the remainder of the Consent Order and the application of the provisions to any other person or circumstance shall not be affected by the holding.

Waiver:  The failure of any party hereto at any time or times to require performance of any provision hereof shall in no manner affect the right of such party at a later time to enforce the same or any other provision of this Consent Order.  No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

Acknowledgements:  Upon being served with copies of this Consent Order after entry by the Court, Settling Defendants shall sign acknowledgments of such service and serve such acknowledgments on the Court and the Commission within seven (7) calendar days.

Continuing Jurisdiction of this Court:  Upon entry of this Consent Order,  this case shall be dismissed with prejudice as to all Settling Defendants, and the Court shall retain jurisdiction of this cause only to assure compliance with this Consent Order.

Authority:   Plunkett hereby warrants that he is the President of UIG, and that this Consent Order has been duly authorized by UIG and he has been duly empowered to sign and submit it on behalf of UIG.  Allotta hereby warrants that he is the President of Allotta, Inc., and that this Consent Order has been duly authorized by Allotta, Inc and he has been duly empowered to sign and submit it on behalf of Allotta, Inc.  Savitsky hereby warrants that he is the President of Savitsky, Inc., and that this Consent Order has been duly authorized by Savitsky, Inc and he has been duly empowered to sign and submit it on behalf of Savitsky, Inc.

There being no just reason for delay, the Clerk of the Court is hereby directed to enter this Consent Order.

**SO ORDERED.**

Dated: June 6, 2006.

**CLOSED CASE**

The Honorable Daniel T.K. Hurley
United States District Court Judge

26

Dated: _3/2-6_____, 2006

*CONSENTED TO AND APPROVED BY:*

Date:_____

_____
Paul Plunkett, Individually and on
behalf of United Investors Group, Inc.

Date: _3/2-6/06_____

_____
Greg Allotta, Individually and on
behalf of Greg Allotta Enterprises, Inc.

Date:_____

_____
Michael Savitsky, III, Individually and on
behalf of Michael Savitsky, Inc.

Date:_____

_____
Andrew Ross, Individually

Approved for Entry:

Date:_____

_____
R. Lawrence Bonner
Francisco O. Sanchez
HOMER & BONNER, P.A.
The Four Seasons Tower
1441 Brickell Avenue
Suite 1200
Miami, Florida 33131
Facsimile: (305) 982-0060
fsanchez@homerbonner.com

*Attorneys for Settling Defendants*

that this Consent Order has been duly authorized by Allotta, Inc and he has been duly empowered to sign and submit it on behalf of Allotta, Inc.  Savitsky hereby warrants that he is the President of Savitsky, Inc., and that this Consent Order has been duly authorized by Savitsky, Inc and he has been duly empowered to sign and submit it on behalf of Savitsky, Inc.

There being no just reason for delay, the Clerk of the Court is hereby directed to enter this Consent Order.

**SO ORDERED**.

_____
The Honorable Daniel T.K. Hurley
United States District Court Judge

Dated: _____, 2006

*CONSENTED TO AND APPROVED BY:*

_____
Paul Plunkett, Individually and on
behalf of United Investors Group, Inc.

Date:_____

_____
Greg Allotta, Individually and on
behalf of Greg Allotta Enterprises, Inc.

Date:_____

_____
Michael Savitsky, III, Individually and on
behalf of Michael Savitsky, Inc.

Date:_____

_____
Andrew Ross, Individually

Date: 3/25/06

Approved for Entry:

_____
R. Lawrence Bonner
Francisco O. Sanchez
HOMER & BONNER, P.A.

Date:_____

27

Consent Order. No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

Acknowledgements: Upon being served with copies of this Consent Order after entry by the Court, Settling Defendants shall sign acknowledgments of such service and serve such acknowledgments on the Court and the Commission within seven (7) calendar days.

Continuing Jurisdiction of this Court: Upon entry of this Consent Order, this case shall be dismissed with prejudice as to all Settling Defendants, and the Court shall retain jurisdiction of this cause only to assure compliance with this Consent Order.

Authority: Plunkett hereby warrants that he is the President of UIG, and that this Consent Order has been duly authorized by UIG and he has been duly empowered to sign and submit it on behalf of UIG. Allotta hereby warrants that he is the President of Allotta, Inc., and that this Consent Order has been duly authorized by Allotta, Inc. and he has been duly empowered to sign and submit it on behalf of Allotta, Inc. Savitsky hereby warrants that he is the President of Savitsky, Inc., and that this Consent Order has been duly authorized by Savitsky, Inc and he has been duly empowered to sign and submit it on behalf of Savitsky, Inc.

There being no just reason for delay, the Clerk of the Court is hereby directed to enter this Consent Order.

**SO ORDERED**.

_____
The Honorable Daniel T.K. Hurley
United States District Court Judge


Dated: _____, 2006


*CONSENTED TO AND APPROVED BY:*


_____         Date:_____
Paul Plunkett, Individually and on
behalf of United Investors Group, Inc.


_____         Date:_____
Greg Allotta, Individually and on
behalf of Greg Allotta Enterprises, Inc.

_____         Date: 3/26/06.
Michael Savitsky, III, Individually and on
behalf of Michael Savitsky, Inc.

Dated: _25 MAR_____, 2006

*CONSENTED TO AND APPROVED BY:*

_____          Date: _26 MR 2006_____
Paul Plunkett, Individually and on
behalf of United Investors Group, Inc.


_____          Date:_____
Greg Allotta, Individually and on
behalf of Greg Allotta Enterprises, Inc.


_____          Date:_____
Michael Savitsky, III, Individually and on
behalf of Michael Savitsky, Inc.


_____          Date:_____
Andrew Ross, Individually

Approved for Entry:


_____          Date:_____
R. Lawrence Bonner
Francisco O. Sanchez
HOMER & BONNER, P.A.
The Four Seasons Tower
1441 Brickell Avenue
Suite 1200
Miami, Florida 33131
Facsimile: (305) 982-0060
fsanchez@homerbonner.com

*Attorneys for Settling Defendants*

27

*Charles D. Marvine*

Charles D. Marvine (Special Florida Bar. No. A5500890)
Rachel A. Hayes (Special Florida Bar. No. A5500891)
Division of Enforcement
Two Emanuel Cleaver II Boulevard, Suite 300
Kansas City, MO  64112
(816) 960-7743 (Marvine)
cmarvine@cftc.gov
(816) 960-7741 (Hayes)
rhayes @cftc.gov
(816) 960-7750 (fax)

Richard Glaser (Special Florida Bar. No. A5500897)
Division of Enforcement
1155 21st Street, N.W.
Washington, D.C. 20581
rglaser@cftc.gov
(202) 418-5358
(202) 418-5519 (fax)

Attorneys for Plaintiff